1

2

3

4

5

6

7

8                    IN THE UNITED STATES DISTRICT COURT

9                  FOR THE EASTERN DISTRICT OF CALIFORNIA

10    LORENZO TORRES,

11              Petitioner,              No. CIV S-01-2052 LKK JFM P

12         vs.

13    PLILER, et al.,

14              Respondents.            FINDINGS & RECOMMENDATIONS

15    _____/

16              Petitioner is a state prisoner proceeding pro se with an application for a writ of

17    habeas corpus pursuant to 28 U.S.C. § 2254.  Petitioner challenges his 1998 conviction on

18    charges of second degree murder and assault with a firearm, in furtherance of a criminal street

19    gang.  He seeks relief on the grounds that: (1) jury instruction error violated his rights to due

20    process and a jury trial; (2) there was insufficient evidence to support his conviction of second

21    degree murder and gang affiliation; (3) the prosecutor committed misconduct in closing

22    argument; and (4) the trial court erred in failing to hold a hearing to determine whether petitioner

23    should receive new counsel to argue a motion for new trial.  Upon careful consideration of the

24    record and the applicable law, the undersigned will recommend that petitioner's application for

25    habeas corpus relief be denied.

26    /////

                                          1

PROCEDURAL AND  FACTUAL BACKGROUND[1]

Loma Bakers and Okie Bakers are rival gangs operating in the Bakersfield area.  On July 12, 1997, a small group of Loma Bakers and their associates went to a quinceaneras to pick up Sabrina Santa Cruz, the girlfriend of Paul Behill, a Loma member.  The quinceaneras was held at Juarez Hall, a facility located in Okie territory.

The group, which included Jacob and Paul Behill, Arthur Florez, and Anthony Bejarano, arrived outside Juarez Hall and encountered a group of Okies.  Woody, an Okie member, called out "how's that Okie life" to Arthur Florez.  In gang parlance, such a question is meant as an insult and a challenge.  A fistfight broke out between the two boys as members from both gangs gathered around to watch.

Sometime during the fight, [petitioner], an Okie member, started shooting at the Loma group.  Jacob Behill was shot and fell as everyone else began to scatter.  Anthony Bejarano ducked between two cars and saw Arthur Florez run through a line of parked cars into a field across the street.  [Petitioner] shot Florez several times and Florez fell.  [Petitioner] walked up to him and, as Florez pleaded for his life, shot him twice in the head.  Both wounds were fatal.  Evidence was later admitted that established Florez had been shot eight times, sustaining wounds in the head, neck, chest, and arms.

On July 16, four days after the homicide, police investigators showed a photographic lineup to Danny Ledesma and Sabrina Santa Cruz, two witnesses at the scene.  Both identified [petitioner] as the shooter.  Cruz also told investigators that Anthony Bejarano had told her he saw [petitioner] shoot Florez as Florez begged for his life.  Michael Craig, a tow truck driver working in the area, told investigators that he saw a person stand over another and shoot him but could not identify anyone because it was too dark.

Police detectives went to [petitioner's] house and spoke to his stepmother.  She told them the family used to live in Okie territory but had since moved.  She stated [petitioner] had been "claiming Okie" for about three years and that his friends were Okies.

On October 2, 1997, the Kern County District Attorney filed an information charging [petitioner] with first degree murder (Pen.

---

[1]  This statement of facts is taken from the June 30, 2000, opinion by the California Court of Appeal for the Fifth Appellate District (hereinafter Opinion), at pgs. 2-4, appended as Exhibit F to Respondent's Answer, filed on August 29, 2002.

Code, § 187 –  count 1),[2] attempted first degree murder (§§664/187 – count 2), and possession of a loaded firearm by an active gang member (§ 12031, subd. (a)(2)(C) – count 3).  Counts 1 and 2 also alleged [petitioner] had committed the offenses to benefit a criminal street gang (§ 186.22, subd. (b)(1)) and that [petitioner] had personally used a firearm (§ 12022.5, subd. (a)).  Finally, count 2 also alleged [petitioner] had inflicted great bodily injury within the meaning of section 12022.7.

Trial commenced on February 26, 1998.  During the prosecution's case, most witnesses recanted their prior statements to the police, as well as those made during the preliminary hearing.  Sabrina Santa Cruz testified she had lied when she identified [petitioner] as the shooter and that she was inside Juarez Hall with [petitioner] at the time of the shooting.  She stated Detective Stratton instructed her to identify [petitioner] because it would make things easier since the police already had [petitioner] in custody.  She could not recall telling investigators that Anthony Bejarano told her he saw appellant shoot Florez.  Danny Ledesma testified he could only identify the shooter as a bald Hispanic male wearing a white T-shirt.  He also stated the second volley of shots that had killed Florez sounded distinctly different from those fired earlier, raising the possibility that someone else shot Florez.  Ledesma acknowledged that he had earlier identified [petitioner] as the shooter, but testified it was only an educated guess.  Anthony Bejarano testified he could not identify the shooter because it had been too dark and denied telling Sabrina Santa Cruz that he had seen [petitioner] shoot Florez.

Officer Cottle testified as an expert on gang practice and culture.  He stated witness intimidation is very common with gang trials and that witnesses often recant their stories on the stand.  He explained there is a code among the gangs against "snitching," even if the testimony would negatively effect a rival gang member.  In this particular case, Officer Cottle testified he had seen certain individuals express nonverbal cues to witnesses outside the courtroom that were clearly threats.  He also testified he had been inside [petitioner's] bedroom and had seen indicia of membership in the Okie gang.

After a four-day trial, the jury convicted [petitioner] of second degree murder, assault with a deadly weapon, and possession of a firearm by an active gang member.  The jury also found all allegations to be true.  On March 20, 1998, [petitioner] filed a motion for a new trial.  On April 16, the court denied the motion and sentenced [petitioner] to a total term of 45 years to life: 15 years to life plus 10 years for the firearm enhancement and three years for the gang enhancement under count 1, and four years plus

---

[2]  All further statutory references are to the Penal Code unless otherwise noted.

1    10 years for the firearm enhancement and three years for the gang
2    enhancement for count 2.  The sentence for count 3 and the
enhancement for great bodily injury were stayed.

3    After the California Court of Appeal issued its opinion affirming petitioner's

4 conviction, petitioner filed a petition for rehearing.  (Answer, Ex. G.)  Upon rehearing, the

5 appellate court modified its opinion to add the following section:

6    VII.  ***The gang enhancement in count one shall be stricken***

7    Both parties agree, as do we, that the trial court incorrectly
imposed a three-year enhancement pursuant to section 186.22,
8    subdivision (b)(1) for count one.  "[S]ubdivision (b)(1) [of section
186.22] specifically excepts prisoners serving a life sentence from
9    the additional term."  (People v. Ortiz (1997) 57 Cal.App.4th 480,
486.)  Because the court sentenced [petitioner] to an indeterminate
10    life sentence on count one, the enhancement pursuant to section
186.22 is unauthorized and shall be stricken.

11

12    2.  On the last page, the disposition should read as follows:

13    The gang enhancement imposed under count one is stricken.  The
trial court is directed to prepare an amended abstract of judgment
14    and forward same to the Department of Corrections.  In all other
respects, the judgment is affirmed.

15 (Answer, Ex. I.)

16                  ANALYSIS

17 I.  <u>Standards for a Writ of Habeas Corpus</u>

18    Federal habeas corpus relief is not available for any claim decided on the merits in

19 state court proceedings unless the state court's adjudication of the claim:

20    (1) resulted in a decision that was contrary to, or involved an
unreasonable application of, clearly established Federal law, as
21    determined by the Supreme Court of the United States; or

22    (2) resulted in a decision that was based on an unreasonable
determination of the facts in light of the evidence presented in the
23    State court proceeding.

24 28 U.S.C. § 2254(d).

25    Under section 2254(d)(1), a state court decision is "contrary to" clearly

26 established United States Supreme Court precedents "if it 'applies a rule that contradicts the

1    governing law set forth in [Supreme Court] cases', or if it 'confronts a set of facts that are

2    materially indistinguishable from a decision'" of the  Supreme Court and nevertheless arrives at

3    different result.  Early v. Packer, 573 U.S. 3, 8 (2002) (quoting Williams v. Taylor, 529 U.S. 362,

4    405-406 (2000)).

5         Under the  "unreasonable application" clause of section 2254(d)(1), a federal

6    habeas court may grant the writ if the state court identifies the correct governing legal principle

7    from the Supreme Court's decisions, but unreasonably applies that principle to the facts of the

8    prisoner's case.  Williams, 529 U.S. at 413.  A federal habeas court "may not issue the writ

9    simply because that court concludes in its independent judgment that the relevant state-court

10   decision applied clearly established federal law erroneously or incorrectly.  Rather, that

11   application must also be unreasonable."  Id. at 412; see also Lockyer v. Andrade, 538 U.S. 63, 75

12   (2003) (it is "not enough that a federal habeas court, in its independent review of the legal

13   question, is left with a 'firm conviction' that the state court was 'erroneous.'")

14        The court looks to the last reasoned state court decision as the basis for the state

15   court judgment.  Avila v. Galaza, 297 F.3d 911, 918 (9th Cir. 2002).  Where the state court

16   reaches a decision on the merits but provides no reasoning to support its conclusion, a federal

17   habeas court independently reviews the record to determine whether habeas corpus relief is

18   available under section 2254(d).  Delgado v. Lewis, 223 F.3d 976, 982 (9th Cir. 2000).

19   II.  Petitioner's Claims

20        A.  Jury Instruction Errors

21        Petitioner's raises several claims of jury instruction error.  After setting forth the

22   applicable legal principles, the court will evaluate these claims in turn below.

23        1.  Legal Standards

24        In general, a challenge to jury instructions does not state a federal constitutional

25   claim.  See Middleton, 768 F.2d at 1085 (citing Engle, 456 U.S. at 119); Gutierrez v. Griggs, 695

26   F.2d 1195, 1197 (9th Cir. 1983).  In order to warrant federal habeas relief, a challenged jury

1  instructions "cannot be merely 'undesirable, erroneous, or even "universally condemned,'" but

2  must violate some due process right guaranteed by the fourteenth amendment." Prantil v.

3  California, 843 F.2d 314, 317 (1988) (quoting Cupp v. Naughten, 414 U.S. 141, 146 (1973)).  To

4  prevail on such a claim petitioner must demonstrate "that an erroneous instruction 'so infected the

5  entire trial that the resulting conviction violates due process.'" Prantil, 843 F.2d at 317 (quoting

6  Darnell v. Swinney, 823 F.2d 299, 301 (9th Cir. 1987)).  See also Estelle, 502 U.S. at 72.  In

7  making its determination, this court must evaluate the challenged jury instructions "'in the

8  context of the overall charge to the jury as a component of the entire trial process.'" Prantil, 843

9  F.2d at 817 (quoting Bashor v. Risley, 730 F.2d 1228, 1239 (9th Cir. 1984)).  Where the

10 challenge is to a refusal or failure to give an instruction, the petitioner's burden is "especially

11 heavy," because "[a]n omission, or an incomplete instruction, is less likely to be prejudicial than

12 a misstatement of the law." Henderson v. Kibbe, 431 U.S. 145, 155 (1977).  See also Villafuerte

13 v. Stewart, 111 F.3d 616, 624 (9th Cir. 1997).

14          2.  STEP Act Allegations[3]

15          In his first claim, petitioner contends that several jury instructions given at his trial

16 regarding the STEP Act violated his right to a jury trial because they mis-stated or omitted

17 certain elements of the charged crimes, thereby allowing the prosecution to obtain a conviction

18 without proof of all essential elements.

19          The state court record reflects that petitioner raised six claims of jury instruction

20 error on direct appeal and in a supplemental petition for rehearing.  (Answer, Ex. B at 45-51, 52-

21 57; Ex. J at 4-5.)  Petitioner claimed, in essence, that the jury instructions given at his trial

22 omitted or erroneously defined certain elements of the STEP Act, as those elements are defined

23 by state law.  (Id.)  The California Court of Appeal did not address these claims in its opinion

24 

---

25          [3]  The California Street Terrorism Enforcement and Protection (STEP) Act, set forth in
   Cal. Pen. Code § 186.20 et seq., was enacted to deal with criminal street gang activity.  In re
26 Nathanial C., 228 Cal.App.3d 990, 995 (1991).

1   affirming petitioner's conviction.  (Answer, Exs. F., I.)  In a subsequently filed petition for

2   review in the California Supreme Court, petitioner raised the same claims and also argued that

3   the jury instructions violated his federal constitutional right to a jury trial.  (Answer, Ex. J at 4-6.)

4   That petition was summarily denied.  (Answer, Ex. K.)

5           Respondent contends that petitioner's jury instruction claims are procedurally

6   defaulted because petitioner failed to raise the federal basis for his claims on every level of direct

7   review.  In support of this argument, respondent cites Rule 29(b)(1) of the California Rules of

8   Court, which provides that the Supreme Court will not consider on petition for review "any issue

9   that could have been but was not timely raised in the briefs filed in the Court of Appeal."

10  Respondent argues that because petitioner did not raise his federal claims before the state

11  appellate court, they were not properly before the state supreme court and are therefore defaulted

12  by virtue of Rule 29(b)(1).  (Answer at 11.)[4]

13          In determining whether or not a procedural default exists, this court must look to

14  the state court decisions.  See Siripongs v. Calderon, 35 F.3d 1308, 1317-18 (9th Cir. 1994)

15  ("unless the state court makes clear that it is resting its decision denying relief on an independent

16  and adequate state ground, it is presumed that the state denial was based at least in part upon

17  federal grounds, and the petitioner may seek relief in federal court").  The California Supreme

18  Court summarily denied petitioner's claims.  (See Answer, Ex. K.)  The court did not impose a

19  procedural bar.  Absent any citation to authority in the Supreme Court's decision, or the

20  existence of a lower state court decision relying on procedural grounds, this court presumes that

21  the California Supreme Court rejected petitioner's claims on the merits.  See Hunter v. Aispuro,

22  982 F.2d 344, 346-47 (9th Cir. 1992).  Similarly, the California Court of Appeal did not rely on a

23  procedural bar in rejecting petitioner's claims.  (Answer, Exs. F, I.)  This court will not apply a

24

25          [4]  Throughout the Answer, respondents argue that all of petitioner's claims are subject to
    the procedural bar imposed by Rule 29(b) of the California Rules of Court.  The court rejects this
26  argument for the reasons explained below.

1    state procedural bar where the state courts have declined to do so.  Accordingly, the court will

2    address petitioner's claims on the merits.

3                         a.  Jury Instructions on the STEP Act

4                  The information against petitioner alleged that the charged offenses of murder and

5    attempted murder (counts one and two) were committed for the benefit of a criminal street gang,

6    within the meaning of Cal. Pen. Code § 186.22(b)(1).  (Clerk's Transcript on Appeal (CT) at

7    185-87.)  Petitioner was also charged with and convicted of a violation of Cal. Pen. Code §

8    12031(a)(2)(C), which prohibits an "active participant in a criminal street gang" from carrying a

9    loaded firearm.  Cal. Pen. Code § 186.22(b)(1) imposes a sentence enhancement on "any person

10   who is convicted of a felony committed for the benefit of, at the direction of, or in association

11   with any criminal street gang, with the specific intent to promote, further, or assist in any

12   criminal conduct by gang members."  As described above, petitioner received a three-year

13   sentence enhancement on counts 1 and 2 pursuant to this statutory provision.[5]

14               Cal. Pen. Code § 186.22(a) provides as follows:

15                  Any person who actively participates in any criminal street gang
                    with knowledge that its members engage in or have engaged in a
16                  pattern of criminal gang activity, and who willfully promotes,
                    furthers, or assists in any felonious criminal conduct by members
17                  of that gang, shall be punished by imprisonment in a county jail for
                    a period not to exceed one year, or by imprisonment in the state
18                  prison for 16 months, or two or three years.

19   Cal. Pen. Code § 186.22(e) defines "pattern of criminal gang activity," generally, as the

20   commission or conviction of two or more of twenty-three enumerated crimes during certain

21   enumerated time periods.  Cal. Pen. Code § 186.22(f) defines "criminal street gang" as an

22   association or group of persons having as one of its primary activities the commission of one or

23   more of the criminal acts enumerated in § 186.22(e).

24   /////

25   ───────────────────

26         [5]  On petition for rehearing, the § 186.22(b)(1) enhancement on count 1 was stricken.
     (Answer, Ex. I.)

                                                    8

1    Petitioner's jury received the following jury instructions with respect to the STEP

2   Act provisions described above:

3          Ladies and gentlemen, so it's crystal clear to you, one of the things
           that has to be proved with regard to a person being a member of a
4          criminal street gang is that it's a *criminal gang* as opposed to a
           motorcycle club or whatever it might be, and that's what the
5          attorney is offering.  So it's very important that you understand that
           if they show proof that somebody from Okie Bakers has committed
6          crimes, it is not to be viewed by you as the defendant committing
           the crime but the members of the gang did it and you *might*
7          *conclude from that that the gang is a criminal street gang* as
           opposed [to] the allegations of an association or neighborhood
8          association like that.

9   (Reporter's Transcript on Appeal (RT) at 152) (emphasis added by petitioner).[6]

10         Pattern of criminal gang activity means the commission of two or
           more – that means the commission of two or more of the following
11         crimes, namely assault with a deadly weapon in violation of the
           Penal Code Section 245(a)(1), robbery in violation of Penal Code
12         Section 212.5(C) and assault with a firearm in violation of Penal
           Code Section 245(A)(2), provided that at least one of those crimes
13         occurred after September 23rd, 1998, and the last of those crimes
           occurred within three years after a prior offense and the crimes
14         were committed on separate occasions or by two or more persons.

15         Criminal street gang means any ongoing organization, association
           or group of three or more persons, whether formal or informal,
16         having as one of *its primary activities the commission of crimes of*
           *violence* which has the common name or common identifying sign
17         or symbol, who's (sic) members individually or collectively engage
           or have engaged in a pattern of the criminal gang activity.

18

19  (Id. at 306) (emphasis added by petitioner).

20         Every person who is convicted of any felony and committed that
           felony for the benefit of, at the direction of or in association with
21         any criminal street gang with the specific intent to promote,
           further, or assist in any criminal conduct by gang members, is
22         guilty of the violation of Section 186.22, sub B, sub 1 of the Penal
           Code, a crime.

23         Again, criminal street gang member is any ongoing organization,
24         association or group of three or more persons whether formal or

25  _____

26         [6]  This jury instruction was given by the trial court <u>sua</u> <u>sponte</u> after the prosecutor offered
    evidence of "predicate offenses" to establish a "pattern of criminal gang activity."  (RT at 152.)

1        informal, having as one of its *primary activities the commission of*
*crimes of the violence displaying a pattern of criminal gang*
2     *activity* which organizations (sic) has a common name or common
identifying sign or symbol, who's (sic) members individually or
3     collectively engage in or have engaged in a pattern of criminal
activity.

4

5  (Id. at 308) (emphasis added by petitioner).

6        On direct appeal of his conviction, petitioner raised the following claims

7  challenging the jury instructions set forth above:

8       (1) The street gang instruction on the "primary activities" test was
erroneous to the extent that it defined applicable offenses merely as
9     "crimes of violence' rather than those offenses enumerated in
Penal Code section 186.22.  (AOB, at pp. 48-49.)

10

11      (2) A companion street gang instruction on the "primary activities"
test was erroneous to the extent that it defined applicable offenses
12    as "crimes of violence displaying a pattern of criminal street gang
activity," which suggested that the predicate offenses establishing a
13    "pattern of criminal gang activity" would establish the current
primary activity of the gang.  (AOB, at p. 49.)

14      (3) An admonishment given by the court when predicate-offense
evidence was introduced to establish the "pattern of criminal street
15    gang activity" erroneously suggested that evidence of prior
offenses by gang members offered to prove the "pattern" also
16    established the nature of the criminal street gang.  The suggestion
was erroneous because, according to People v. Gardeley (1996) 14
17    Cal.4th 605, the predicate offenses of individual gang members
need not be gang related, which means that the 'pattern of criminal
18    gang activity' engaged in by members does not necessarily have
anything to do with the primary activities of the gang itself.  (AOB,
19    at pp. 46-48.)

20      (4) . . . the trial court's sua sponte duty to instruct on "general
principles of law that are commonly or closely and openly
21    connected to the facts before the court and that are necessary for
the jury's understanding of the case" (see People v. Mayfield
22    (1997) 14 Cal.4th 688, 773) included the duty to instruct sua
sponte on the rule of In re Elodio O. (1997) 56 Cal.App.4th 1175,
23    1177, that the "primary activities" test requires proof of crimes by
evidence other than the current crimes, and that the trial court's
24    failure to so instruct was error.  (AOB, at pp. 49-50.)  The Attorney
General argued that People v. Galvan (1998) Cal.App.4th 1135
25    (sic) should be followed instead.

26  (Answer, Ex. H at 4-6; Ex. J at 4-5.)

1    Petitioner's jury was also given the following instruction:

2    Every person who is an active member who, with knowledge of its
     presence, carries a loaded firearm on his person or in a vehicle
3    while on any public street is guilty of a felony.  To prove this crime
     all of the following elements must be proven; one, a person
4    actively participated in a criminal street gang.  Two, the members
     of such gang are engaged in or have engaged in a pattern of
5    criminal gang activity.  Three, that person had knowledge that the
     gang members engage in or have engaged in a pattern of the
6    criminal gang activity.  And four, the person carried a loaded
     firearm on his person in a vehicle or in a public street.

7

8    (RT at 305-06.)  With respect to this jury instruction, petitioner raised the following claims on

9    direct appeal:

10    (5) Concerning Penal Code section 12031, the instruction
      erroneously described the active-participation test in the past tense,
11    erroneously suggesting that a mere gang "member" who actively
      "participated" in the past was covered by the statute.  (AOB, at p.
12    52-54.)

13    (6) Appellant claimed that the trial court's <u>sua</u> <u>sponte</u> duty to
      "define terms having a technical meaning peculiar to the law (<u>see</u>
14    <u>People v. Mayfield</u>, <u>supra</u>, 14 Cal.4th 688, 773) included the duty
      to instruct <u>sua</u> <u>sponte</u> on the rule of <u>People v. Green</u> (1991) 227
15    Cal.App.4th 692, 699-701, which defined "active participation" in
      a manner which would avoid constitutional challenge for
16    vagueness and overbreadth, to wit, the relationship with the gang
      must be (1) more than nominal, passive, inactive or purely
17    technical, and (2) the person must devote all, or a substantial part
      of his time and efforts to the criminal street gang, and that the trial
18    court's failure to so instruct was error.  (AOB, at pp. 54-55.)
      Although the "all, or a substantial part of his time . . ." definition of
19    <u>Green</u> has been disapproved, the "more than nominal, passive,
      inactive or purely technical" definition remains.  (<u>People v.</u>
20    <u>Castenada</u> (2000) 81 Cal.4th 743.)

21    (Answer, Ex. H at 4-6; Ex. J at 4-5.)  As noted above, the California Court of Appeal did not

22    specifically address these claims of jury instruction error in its written opinion affirming

23    petitioner's conviction.  (Answer, Exs. F, I.)  However, petitioner raised the same claims of jury

24    instruction error in a petition for review to the California Supreme Court.  (Answer, Ex. J at 6.)

25    The Supreme Court summarily denied all of petitioner's claims.  (Answer, Ex. K.)  Because no

26    California court provided a reasoned decision on petitioner's claims of jury instruction error, this

11

1 court will independently review the record to determine whether habeas corpus relief is available

2 under section 2254(d).  Delgado, 223 F.3d at 982.

3        The decision of the California courts that petitioner's jury instructions did not

4 omit or misstate the elements of the STEP Act, as those elements are defined by state law, may

5 not be set aside in this federal habeas corpus proceeding.  A federal writ is not available for

6 alleged error in the interpretation or application of state law.  See Estelle v. McGuire, 502 U.S.

7 62, 67-68 (1991); Park v. California, 202 F.3d 1146, 1149 (9th Cir. 2000).  The Ninth Circuit has

8 specifically refused to consider state law errors in the application of state sentencing law.  See,

9 e.g., Estelle, 502 U.S. at 62; Miller v. Vasquez, 868 F.2d 1116, 1118-19 (9th Cir. 1989).  Further,

10 federal courts are "bound by a state court's construction of its own penal statutes."  Aponte v.

11 Gomez, 993 F.2d 705, 707 (9th Cir. 1993).  This court must defer to California's interpretation of

12 the STEP Act unless its interpretation is "untenable or amounts to a subterfuge to avoid federal

13 review of a constitutional violation."  Oxborrow v. Eikenberry, 877 F.2d 1395, 1399 (9th Cir.

14 1989.)  There is no evidence of that here.  The state courts' decision with regard to petitioner's

15 jury instruction claims is not contrary to or an unreasonable application of federal law.  There is

16 no federal constitutional requirement that a state sentencing scheme define gang participation or

17 gang activity in any particular manner.

18        Even assuming that the jury instructions given at petitioner's trial with regard to

19 the STEP Act were erroneous, any error was harmless under the circumstances of this case.  See

20 Brecht v. Abrahamson, 507 U.S. 619, 623 (1993) (on habeas review, test for harmless error is

21 whether error "had substantial and injurious effect or influence in determining the jury's

22 verdict").  See also Neder v. United States, 527 U.S. 1, 9, 11 (1999) (instructional errors that

23 impose a mandatory presumption with respect to an element of the crime, that misstate an

24 element of the crime or that remove an element from the jury's consideration may be reviewed

25 for harmless error); California v. Roy, 519 U.S. 2 (1996) (applying Brecht standard to a claimed

26 /////

1  omission from a jury instruction).  Accordingly, petitioner's claims of jury instruction error

2  should be denied.

3  　　　　　　b. Apprendi Claim

4  　　　　　　On petition for review to the California Supreme Court, petitioner argued that the

5  court should grant review to determine whether the additional three-year STEP enhancement on

6  count 2, which elevated the sentence beyond the statutory maximum term for that offense,

7  violated the Sixth Amendment right to a jury trial, as set forth in Apprendi v. New Jersey, 530

8  U.S. 466 (2000).[7]  (Answer, Ex. J at 5-7.)  In Apprendi, the United States Supreme Court held

9  that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime

10  beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a

11  reasonable doubt."  Id. 530 U.S. at 490.  As described above, that is exactly what happened here:

12  the facts that triggered the application of the STEP Act were submitted to petitioner's jury and

13  the jury found true the sentence enhancement allegations.  (See CT at 344, 349, 352.)

14  Accordingly, petitioner has failed to demonstrate an Apprendi violation.

15  　　　　　　2. Cautionary Instruction

16  　　　　　　In his second claim of jury instruction error, petitioner contends that the trial court

17  erred when it failed to give a sua sponte jury instruction cautioning the jury that it could not

18  consider witness intimidation as evidence of petitioner's guilt of the charged crimes unless it

19  found that petitioner had authorized the intimidation.  Petitioner notes that Officer Cottle, the

20  prosecution expert on gang practice and culture, stated that he observed behavior from an Okie

21  Bakers gang member which appeared to be a threat to a prosecution witness.  He argues the trial

22  court should have instructed the jury that this testimony could not be considered as evidence of

23  petitioner's guilt.

24  _____

25  　　　[7] Apprendi does not apply retroactively to cases on collateral review.  Schriro v.
Summerlin, 542 U.S. 348 (2004); Blakely v. Washington, 542 U.S. 296 (2004) (O'Connor, J.,
dissenting).  However, because petitioner's sentence became final on direct review after

26  Apprendi was decided, the rule stated therein applies to this case.  (Id.)

1    The California Court of Appeal concluded that the trial court's failure to give a

2    cautionary instruction was harmless error.  The court reasoned as follows:

3                    There is no reasonable probability the outcome of the case would
                     have been more favorable to [petitioner] had a cautionary
4                    instruction been given.  (citation omitted).  First, the evidence of
                     witness intimidation was admitted not to show [petitioner's] guilt,
5                    but to show that the witnesses had a strong motive to lie on the
                     stand.  Thus, an instruction not to consider the evidence as proof of
6                    guilt might have invited the jury to view it in new light that was
                     unfavorable to [petitioner].  'Any benefit of a cautionary
7                    instruction is 'debatable' in that it may tend to highlight the fact it
                     was intended to minimize."  (citation omitted).  Second, we find
8                    the evidence against [petitioner] sufficiently strong to withstand
                     scrutiny even if error occurred.  After review of the record, we
9                    cannot agree the jury would have rendered a different verdict had
                     the omitted instruction been given.
10

11   (Opinion at 15-16.)

12                   The decision of the California Court of Appeal that any error in failing to give a

13   cautionary jury instruction was harmless is not contrary to federal law and should not be set

14   aside.  See Inthavong v. LaMarque, 2005 WL 2008524, *3 (C.A.9 (Cal.) 2005) (to grant relief

15   where a state court has determined that a constitutional error was harmless, a reviewing court

16   must determine both (1) that the state court's decision was "contrary to" or an "unreasonable

17   application" of Supreme Court harmless error precedent, and (2) that the petitioner suffered

18   prejudice under Brecht from the constitutional error).  As discussed by the state appellate court, a

19   jury instruction highlighting Officer Cottle's testimony that he observed witness tampering might

20   have resulted in more prejudice than the omission of such an instruction.  Further, the case

21   against petitioner was strong and may have been rendered even stronger by the fact that virtually

22   all of the prosecution witnesses recanted their previous version of the events by the time of trial

23   and offered, instead, implausible explanations of what occurred.  Under these circumstances,

24   petitioner cannot demonstrate that the trial court's failure to give the suggested cautionary

25   instruction rendered petitioner's trial fundamentally unfair or had an injurious effect on the

26   verdict.  Brecht, 507 U.S. at 637.  Because petitioner has failed to demonstrate harmless error

                                                      14

1  under <u>Brecht</u>, he is not entitled to habeas corpus relief on this claim. <u>Inthavong</u>, 2005 WL

2  2008524 at 5 - 6.

3  　　　　B. <u>Sufficiency of the Evidence</u>

4  　　　　　　1. <u>STEP Act</u>

5  　　　　　Petitioner raises several claims challenging the sufficiency of the evidence to

6  support his convictions.  In his first such claim, petitioner argues that there was insufficient

7  evidence to support the jury's finding that he committed the charged crimes for the benefit of a

8  criminal street gang, pursuant to Cal. Pen. Code § 186.22(b)(1).  Specifically, he argues that there

9  was insufficient evidence that the Okie Bakers was a "criminal street gang," as defined in the

10  STEP Act.

11  　　　　　Pursuant to California law, the term "criminal street gang" has "four distinct

12  elements:"

13  　　　　　　[C]riminal street gang is the linchpin for the act's provisions.  The
14  phrase is defined specifically, and its application requires proof of
　　multiple elements.  A criminal street gang is defined as '[1] any
15  ongoing organization . . . of three or more persons, whether formal
　　or informal, [2] having as one of its primary activities the
16  commission of one or more [of 23 enumerated crimes listed in §
　　186.22, subd. (d)], [3] which has a common name or common
17  identifying sign or symbol, [4] whose members individually or
　　collectively engage in or have engaged in a pattern of criminal
　　gang activity.

18

19  (Opinion at 5; <u>In re Nathaniel C.</u>, 228 Cal.App.3d 990, 1000 (1991)).  On direct appeal,

20  petitioner argued that the prosecution did not introduce sufficient evidence of the second and

21  fourth elements.   (Opinion at 5.)  With respect to the fourth element ("pattern of criminal gang

22  activity"), the California Court of Appeal explained as follows:

23  　　　　　　To establish the fourth element, pattern of criminal gang activity,
　　the prosecution must prove members of the gang individually or
24  collectively committed two or more of the 23 offenses listed in
　　section 186.22, subdivision (e).  To meet this threshold, the
25  prosecution introduced into evidence the 1990 and 1991
　　convictions of two Okie Baker members for assault with a firearm

26

15

and assault with a deadly weapon.  Both offenses are listed in section 186.22, subdivision (e).

To establish pattern, "the statute requires only that the offenses be 'committed on separate occasions, *or* by two persons . . . .' (§ 186.22, subd. (d), italics added.)  The use of the disjunctive in defining 'pattern of criminal gang activity' means a pattern can be established by two or more incidents, each with a single perpetrator, or by a single incident with multiple participants committing one or more of the specified offenses . . . ." (Nathaniel C., supra, 228 Cal.App.3d at p. 1003.)  Here, the prosecution adequately proved a pattern of criminal activity by establishing the commission of two incidents, each by a single perpetrator who was a member of the Okie gang.

[Petitioner] counters that a showing of a pattern with two incidents by a single perpetrator must include a current offense as one of the incidents.  He makes this argument because subdivision (e) of section 186.22 requires that the last offense, which, under appellant's theory would always be the current one, was committed less than three years after the first offense.  As applied here, this would mean the prosecution would have had to prove pattern by using appellant's current offense, committed in 1997, and another offense committed no more than three years prior.  Since the only priors the prosecution presented were committed in 1990 and 1991, appellant contends the element of pattern has not been established.  The argument, however, is flawed at its foundation.  Though the prosecution is permitted to use a current offense to help prove the element of pattern, it is not obligated to do so.  (People v. Loeun (1997) 17 Cal.4th 1, 10.)  To the contrary, the prosecution can present two or more past offenses, ignoring the current offenses, to prove a pattern of criminal activity.  Of course, the offenses must have been committed within a three-year time span.  That requirement was met here.  The prosecution introduced into evidence two past offenses committed by two members of the Okie gang that occurred within three years of one another.

(Id. at 5-6.)

With respect to the second element ("primary activity"), the California Court of

Appeal explained as follows:

[Petitioner] also challenges the sufficiency of the evidence presented to prove the element of primary activity.  That element is proven if the prosecution introduces credible evidence that the gang "[has] as one of its primary activities the commission of one or more [of the 23 crimes listed in subd. (e)]." (§ 186.22, subd. (f).)

/////

1
2
3
4
5
6

> In In re Elodio (1997) 56 Cal.App.4th 1175, this court required the
> element of primary activities be proven with evidence of past
> activity and not current offenses.  That view was rejected by the
> First District in People v. Galvan (1998) 68 Cal.App.4th 1135
> which interpreted section 186.22, subdivision (f) as permitting the
> application of current offenses to prove the element of primary
> activities.  Here, the Attorney General invites this court to
> reconsider our position in Eloldio and adopt the reasoning in
> Galvan.  However, because we find sufficient evidence outside the
> current offenses to prove the element of primary activity, we need
> not reach the argument.

7   (Id. at 6-7.)

8           After a review of the record, and specifically the testimony of Officer Cottle, the

9   state appellate court found that "the prosecution adequately established that witness intimidation,

10  one of the 23 offenses enumerated in section 186.22, subdivision (e), was a primary activity of

11  the Okie Bakers."  (Id. at 7.)  The court found "Officer Cottle's testimony regarding witness

12  intimidation by gangs in general, along with specific examples of such intimidation committed

13  by the Okie Bakers, sufficient to permit the reasonable inference that a primary activity of the

14  Okie Bakers was witness intimidation.  Accordingly, we find this element of section 186.22

15  satisfied."  (Id. at 9.)

16          In a supplemental petition for rehearing, petitioner argued that because

17  petitioner's jury "was not instructed that 'witness intimidation' was one of the enumerated

18  offenses which would satisfy the 'primary activities' test, the criminal street gang finding cannot

19  be sustained on that theory."  (Answer, Ex. H at 2.)[8]  Petitioner cited state case law in support of

20  his argument that "in applying the substantial evidence test, the reviewing court may not rely on

21  theories upon which the jury received no instruction."  (Id. at 3.)  Petitioner's argument in this

22  regard was summarily denied by the California Court of Appeal.  (Answer, Ex. I.)

23

24          [8] Petitioner's jury was instructed that a pattern of criminal gang activity "means the
    commission of two or more of the following crimes, assault with a deadly weapon, assault with a
25  firearm, provided at least one of those crimes occurred after September 23, 1988, and the last of
    those crimes occurred within three years of a prior offense . . ."  (RT at 308.)  The jury did not
26  receive an instruction stating that witness intimidation could also count as part of a pattern of
    criminal gang activity.

1    There is sufficient evidence to support a conviction if, "after viewing the evidence

2    in the light most favorable to the prosecution, any rational trier of fact could have found the

3    essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307,

4    319 (1979). See also Prantil v. California, 843 F.2d 314, 316 (9th Cir. 1988) (per curiam). "Put

5    another way, the dispositive question under Jackson is 'whether the record evidence could

6    reasonably support a finding of guilt beyond a reasonable doubt.'" Chein v. Shumsky, 373 F.3d

7    978, 982 (9th Cir. 2004) (quoting Jackson, 443 U.S. at 318).[9]  The court must review the entire

8    record when the sufficiency of the evidence is challenged in habeas proceedings. Adamson v.

9    Ricketts, 758 F.2d 441, 448 n.11 (9th Cir. 1985), vacated on other grounds, 789 F.2d 722 (9th

10   Cir. 1986) (en banc), rev'd, 483 U.S. 1 (1987).  It is the province of the jury to "resolve conflicts

11   in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to

12   ultimate facts." Jackson, 443 U.S. at 319. "The question is not whether we are personally

13   convinced beyond a reasonable doubt.  It is whether rational jurors could reach the conclusion

14   that these jurors reached." Roehler v. Borg, 945 F.2d 303, 306 (9th Cir. 1991).  The federal

15   habeas court determines sufficiency of the evidence in reference to the substantive elements of

16   the criminal offense as defined by state law. Jackson, 443 U.S. 307, 324 n.16; Chein, 373 F.3d at

17   983.

18    The state appellate court's decision rejecting petitioner's sufficiency of the

19   evidence claim is not contrary to federal law, as set forth above, and should not be set aside.  The

20   state court reached its decision after reviewing the evidence "as a whole and in the light most

21   favorable to the judgment." (Opinion at 9.)  This legal standard is consistent with the federal

22   standard set forth in Jackson.  Further, the state court's analysis of petitioner's claims is not

23

24    [9]  The Ninth Circuit Court of Appeals has declined to consider the question of whether
      the AEDPA requires an additional degree of deference to state courts' resolution of sufficiency of
25   the evidence claims. See Bruce v. Terhune, 376 F.3d 950, 956 (9th Cir. 2004); Chein, 373 F.3d
      at 983.  Because petitioner's claim fails under the Jackson standard this court also need not
26   decide whether the enactment of the AEDPA altered that test for purposes of federal habeas
      proceedings.

based on an unreasonable determination of the facts of this case.  There was sufficient evidence

introduced at petitioner's trial to demonstrate that a primary activity of the Okie Bakers was

witness intimidation and that its members engaged or had engaged in a pattern of criminal gang

activity.  Under the facts presented at trial, a reasonable juror could have found beyond a

reasonable doubt that petitioner was guilty of the charged crimes for the benefit of a "criminal

street gang," as that term is defined under California law.  Accordingly, petitioner is not entitled

to relief on his claim of insufficient evidence.

## 2. Evidence in the Form of Hearsay

Petitioner also claims there is insufficient evidence to support his conviction on

charges of second degree murder and assault with a firearm because his convictions were based

on "[in]admissible hearsay and multiple hearsay, in form of prior inconsistent statements of

recanting witnesses who were rival gang members or associates of rival gang members."  (Pet. at

6B.)

The decision of the state court of appeal is the last reasoned state court rejection

of petitioner's insufficient evidence claim.  The state court rejected the claim as follows:

> First, Officer Cottle provided credible and logical testimony that
> recanting witnesses are quite common in gang-related cases.  He
> supported this assertion with specific examples of witness
> intimidation in this case.  Just outside the courtroom Officer Cottle
> saw and testified to incidents in which Okie members had made
> intimidating and threatening overtures to pending witnesses.
> Moreover, the audience was filled with Okie members sitting in
> support of [petitioner], and who directly faced the witnesses whose
> testimony might put their "brother" in prison.  Most importantly, a
> reading of the record strongly supports the conclusion that many of
> the witnesses feared for their lives and patently lied in an effort to
> avoid retaliation from the Okie gang.  For example, Sabrina Santa
> Cruz testified the police forced her to identify [petitioner's] picture
> in the photo lineup instead of another person she thought
> resembled the shooter.  At the same time, however, she repeatedly
> testified she never saw the shooter because she was inside Juarez
> Hall during the entire incident.  When asked, she could not explain
> the inconsistency in those statements and retreated to her position
> that she knew nothing about the shooting except that her pretrial
> identification of [petitioner] was incorrect.

Second, we are not persuaded that [petitioner's] convictions rest upon hearsay and double hearsay statements that are cloaked with unreliability.  To the contrary, the circumstances of the case strongly suggest that certain witnesses had initially told the truth to Detective Stratton and then lied on the stand.  "[I]f the verdict is supported by substantial evidence, this court must accord due deference to the trier of fact and not substitute its evaluation of a witness's credibility for that of the fact-finder.  [Citations.]" (citation omitted).  In this instance, the jury clearly found Detective Stratton's testimony about the statements made by recanting witnesses to contain the "true" story of what happened.  During his testimony, Detective Stratton relayed Danny Ledesma's statement that he believed [petitioner] was the shooter.  He also stated that Danny had never mentioned the possibility of a second gun or second shooter.  When asked about Sabrina Santa Cruz, Detective Stratton testified she told him she witnessed the fight between Woody and Florez and saw [petitioner] begin shooting.  He also denied forcing Sabrina to pick out [petitioner] during the photo lineup and explained the police did not even have [petitioner] in custody at the time she made the identification.  He testified Sabrina had expressed considerable fear of retaliation and was concerned about her child's safety.  Finally, Detective Stratton testified Sabrina had told him that Anthony Bejarano told her he saw [petitioner] shoot Florez.

After review of the record, we find Detective Stratton's testimony, coupled with photo lineup cards with signatures from witnesses who identified [petitioner] as the shooter, to constitute sufficient evidence to support [petitioner's] convictions for assault with a firearm and murder.  That some of the testimony included double hearsay does not compel a different result.  "Although the probative value of hearsay evidence decreases with each level of hearsay [citation], one particular instance of multiple hearsay may be more reliable than another instance of single hearsay.  The weight to be accorded [the witness's] statements was for the jury to determine.  (citations omitted).

(Opinion at 13-14.)

After reviewing the entire record, this court finds that the state court's conclusion that there was sufficient evidence to establish petitioner's guilt beyond a reasonable doubt is not an unreasonable application of the federal due process standards set forth above, nor was it based on an unreasonable determination of the facts.  Petitioner does not argue that any hearsay evidence was improperly admitted and he has failed to demonstrate that properly admitted hearsay evidence may not form a part of the evidence against a criminal defendant.  Under the

1   circumstances of this case, the prosecution's use of hearsay to prove its case did not violate

2   petitioner's due process rights.  Accordingly, this claim should be denied.[10]

3        C.   <u>Prosecutorial Misconduct</u>

4           Petitioner's next claim is that the prosecutor committed misconduct by virtue of

5   several remarks made during closing argument.  Petitioner specifically objects to the prosecutor's

6   remarks that: (1) witnesses who gave exonerating testimony at trial did so only because they

7   feared death from petitioner's gang members; (2) the prosecutor would have lied on the stand

8   under these circumstances if he had been a witness because "it is only human not to want to die;

9   (3) in his own experience, recanting witnesses are common; (4) he was frustrated by the

10  witnesses' change of testimony; and (5) the jurors should put themselves in the shoes of the

11  witnesses who feared death.  (Pet. at 6A).  Petitioner argues that there was no evidence the Okie

12  Bakers retaliated against witnesses or had specifically threatened any of the prosecution

13  witnesses.  (<u>Id.</u>)

14          The decision of the state court of appeal is the last reasoned state court rejection

15  of petitioner's claim of prosecutorial misconduct.  The state court rejected the claim as follows:

16          In the context of closing arguments, allegations of prosecutorial
            misconduct are particularly difficult to establish because the
17          prosecutor exercises considerable discretion when making his or
            her argument to the jury.

18

19          "It is settled that a prosecutor is given wide latitude during
            argument.  The argument may be vigorous as long as it amounts to
20          fair comment on the evidence, which can include reasonable
            inferences, or deductions to be drawn therefrom. [Citations.] It is

21

22      [10]   On direct appeal, petitioner also argued there was insufficient evidence to support his
    conviction of possession of a loaded firearm by an active gang member because there was
23  insufficient evidence to establish that he was "active" in the gang at the time of the shooting.
    (Opinion at 14.)  The state appellate court rejected that claim on the grounds that the discovery of
24  gang-related items in petitioner's bedroom, the location and substance of petitioner's tattoos, the
    fact that petitioner had a gang nickname, and testimony of petitioner's stepmother that petitioner
25  had been "claiming Okie," provided sufficient evidence that petitioner was an active member of
    the Okie Bakers at the time of the shooting.  (<u>Id.</u> at 14-15.)  The state court's decision in this
26  regard is not contrary to or an unreasonable application of federal law.  Accordingly, to the extent
    that petitioner is raising this claim in the instant petition, it should be denied.

also clear that counsel during a summation may state matters not in evidence, but which are common knowledge or are illustrations drawn from common experience, history or literature. [Citations.] The prosecutor is entitled to draw conclusions from the evidence presented and to state them to the jury.  The right is very broad and includes the opportunity to fully state his views as to what the evidence shows and as to the conclusions to be drawn therefrom. [Citations]."  (People v. Sassounian (1986) 182 Cal.App.3d 361, 396.)

[Petitioner] complains that the prosecutor made seven statements during closing argument that constituted misconduct: (1) he only handled gang cases; (2) asking the jury to stand in the shoes of the witnesses; (3) it is only human to not want to die; (4) he would probably have lied if he was a witness; (5) Danny Ledesma was trying to save his life when he testified that he heard a second gun shoot Flores; (6) lies are "'what you're going to get a lot of times'" and that he wants to "'pull [his] hair out'" (italics omitted); and (7) he is frustrated by lying witnesses and asking the jury to not let the gang benefit from its wrongdoing.

None of these statements constitutes misconduct.  The prosecutor's comments about the witnesses' motivation to lie on the stand and to prevent retaliation were proper conclusions drawn from evidence provided by Officer Cottle and Detective Stratton concerning gang culture and the actions of the Okie gang outside the courtroom.  This is true as well with statements that Danny Ledesma's testimony was untrue and that the prosecutor is often frustrated with gang cases because witnesses will recant their previous statements to law enforcement when called to testify. Though we are more troubled by the prosecutor's remarks to the jury to put itself in the shoes of the witnesses and that he would also lie if on the stand, we ultimately conclude no misconduct occurred.  To successfully establish prosecutorial misconduct, it must be shown that the prosecutor attempted to persuade the jury with deceptive and reprehensible methods.  (People v. Strickland (1974) 11 Cal.3d 946, 955.)  In our view, neither of these comments can fairly be characterized as such.  Rather, they constituted a hard-hitting and realistic view of what gang-related cases entail and what is at stake.  Since the prosecutor had to explain the discrepancies between the witnesses' testimonies and what Detective Stratton stated he learned during his investigation, we conclude the prosecutor was entitled to make an argument that included references to the realities of gang life and the fears certain witnesses held while testifying.

Moreover, even assuming the validity of [petitioner's] claim, and that an admonition could not have cured the errors, we nonetheless find there is no reasonable probability that the outcome would have

/////

1    been more favorable to [petitioner] in the absence of the contested
2    statements.  (People v. Watson, supra, 46 Cal.2d at p. 836.)

3    (Opinion at 17-18.)

4           A criminal defendant's due process rights are violated when a prosecutor's

5    misconduct renders a trial fundamentally unfair.  Darden v. Wainwright, 477 U.S. 168, 181

6    (1986).  Claims of prosecutorial misconduct are reviewed "'on the merits, examining the entire

7    proceedings to determine whether the prosecutor's [actions] so infected the trial with unfairness

8    as to make the resulting conviction a denial of due process.'"  Johnson v. Sublett, 63 F.3d 926,

9    929 (9th Cir. 1995) (citation omitted).  See also Greer v. Miller, 483 U.S. 756, 765 (1987);

10   Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974); Turner v Calderon, 281 F.3d 851, 868 (9th

11   Cir. 2002).  Relief on such claims is limited to cases in which the petitioner can establish that

12   prosecutorial misconduct resulted in actual prejudice.  Johnson, 63 F.3d at 930 (citing Brecht v.

13   Abrahamson, 507 U.S. 619, 637-38 (1993)); see also Darden, 477 U.S. at 181-83; Turner, 281

14   F.3d at 868.  Put another way, prosecutorial misconduct violates due process when it has a

15   substantial and injurious effect or influence in determining the jury's verdict.  See Ortiz-

16   Sandoval v. Gomez, 81 F.3d 891, 899 (9th Cir. 1996).  Finally, it is the petitioner's burden to

17   state facts that point to a real possibility of constitutional error in this regard.  See O'Bremski v.

18   Maass, 915 F.2d 418, 420 (9th Cir. 1990).

19          In order to determine whether a prosecutor engaged in misconduct, it is necessary

20   to place the prosecutor's remarks in context.  See United States v. Robinson, 485 U.S. 25, 33

21   (1988) ("[P]rosecutorial comment must be examined in context. . . .");  Greer v. Miller, 483 U.S.

22   756, 765-66 (1987); Williams v. Borg, 139 F.3d 737, 745 (9th Cir. 1998).  In fashioning closing

23   arguments, prosecutors are allowed "reasonably wide latitude," United States v. Birges, 723 F.2d

24   666, 671-72 (9th Cir. 1984), and are free to argue "reasonable inferences from the evidence."

25   United States v. Gray, 876 F.2d 1411, 1417 (9th Cir. 1989).  See also Ducket v. Godinez, 67 F.3d

26   734, 742 (9th Cir. 1995).  "[Prosecutors] may strike 'hard blows,' based upon the testimony and

1   its inferences, although they may not, of course, employ argument which could be fairly

2   characterized as foul or unfair." <u>United States v. Gorostiza</u>, 468 F.2d 915, 916 (9th Cir. 1972).

3   <u>See</u> <u>also</u> <u>United States v. Rude</u>, 88 F.3d 1538, 1548 (9th Cir. 1996).  A court should "not reverse

4   a defendant's conviction if substantial, independent and credible evidence of the defendant's

5   guilt overwhelms whatever incriminating aspects inadmissible statements may have had in

6   isolation."  <u>United States v. Davis</u>, 932 F.2d 752, 761 (9th Cir. 1991) (quoting <u>United States v.</u>

7   <u>Marsh</u>, 894 F.2d 1035, 1040 (9th Cir. 1990)).

8           The state appellate court's decision that the prosecutor's challenged comments

9   were proper is not contrary to the federal principles set forth above and should not be set aside.

10   Under the circumstances of this case, where it appeared that the prosecution witnesses had all

11   changed their stories because of fear of reprisal, the prosecutor's comments were not

12   prejudicially unfair.  In fact, many of the comments were necessary to put the discrepancies

13   between the witnesses' prior statements and their testimony on the stand into context.  The

14   remarks were also reasonable inferences from evidence of witness intimidation provided by

15   Officer Cottle.  Further, in light of the evidence in this case, petitioner has failed to show that the

16   prosecutor's improper closing argument "had substantial and injurious effect or influence in

17   determining the jury's verdict" and resulted in "actual prejudice."  <u>See</u> <u>Brecht</u>, 507 U.S. at 636-

18   38.  Accordingly, relief as to this claim should be denied.

19        D.  <u>Trial Court's Failure to Conduct a Marsden Inquiry in Connection with Motion for</u>

20   <u>New Trial</u>

21           In his next claim, petitioner contends that the trial judge erred in denying

22   petitioner's motion for new trial and, in particular, in failing to conduct a <u>Marsden</u> inquiry to

23   determine whether substitute counsel should have been appointed to argue the motion.[11]

24

25        [11] In <u>People v. Marsden</u>, 2 Cal. 3d 118 (1970), the California Supreme Court held that a

26   trial court must permit a defendant seeking a substitution of counsel after the commencement of
  the prosecution's case to specify the reasons for his request.

The state court record reflects that prior to sentencing petitioner filed a motion for new trial based, in part, on ineffective assistance of trial counsel.  (CT at 376-81.)  With respect to that claim, the brief in support of the motion stated, in pertinent part:

"Defendant TORRES is particularly concerned because the alleged threats made to MS. SANTA CRUZ did not come from him, but from MARCO LOZANO and his family and friends.  This was reported in police reports provided in discovery.  Defendant TORRES believes defense counsel should have clarified that the threats came from MR. LOZANO, the original suspect in the murder of ARTHUR FLOREZ, and not from MR. TORRES.

"Further, Defendant TORRES was concerned by Mr. Ledesma's testimony that it sounded like there were two guns.  Defense counsel did not bring out in the questioning of Detective STRATTON that it was never determined that the caliber of weapon used on the shooting victims was the same and if it was in fact possible that it could have been different weapons.  This is how Detective STRATTON testified in the preliminary hearing. Defendant TORRES feels that defense counsel should have brought this out during the trial.

Finally, defendant TORRES feels defense counsel should have objected to admission of all gang related evidence from the photographs of his bedroom to the testimony of gang expert, Officer COTTLE.  It is clear to him that the admission of this evidence caused the jury to accept the impeachment testimony of the prosecution civilian witnesses rather than direct testimony of these witnesses which failed to identify defendant TORRES as responsible for the shooting of victim BEHILL and the killing of victim FLOREZ.

(Id. at 380-81.)

Petitioner's trial counsel made the following arguments at the hearing on the motion for new trial based on the claim of ineffective assistance of trial counsel:

THE COURT: Ineffective assistance of counsel.

MR. SORIA (petitioner's counsel): My client a couple days before had some very strong feelings.  He wanted these addressed to the court.

THE COURT: Sure.

MR. SORIA: I think he may want to – wish to address them.  With regards to myself, it is kind of hard to attack myself.  But I did outline what he thought I did improperly as best I could without

pointing to a Marsden situation.  Some of it is addressed in the first deal because he wanted immediate [sic] to oppose my mention of gang or any type of gang evidence.  But as the court knows, current state of the law is if they charge that gang enhancement, pretty much anything – if they go through a gang expert, it is very broad and literally impossible to object to anything as long as they can be relevantly connected to gangs.  It is discretion of the court.  And I believe I did object to some of the pictures and the court kept some of them out.  But with regards to that, that's the position which also ties into my original motion because if that section is not there, then I would have been in a better position to object to some of the material. . .

MR. SORIA: I would say that the supplemental, your Honor, is my client's complaints about my performance or what he perceived to be unfair conduct by the District Attorney.  I framed on that sense [sic] because I felt that it would be better for him to have a framework, proper motions and get the court consideration with regards to my activities.  Unless the court has some questions, I will probably remain mute.

(RT at 338-41.)  After listening to counsel's arguments, the trial court summarily denied the

motion for new trial.  (Id. at 341.)  Subsequently, the trial judge asked petitioner whether he had

read the motion for new trial filed on his behalf and whether counsel had "cover[ed] in there the

sorts of things that you thought he should have brought out or should have tried to keep out."

(Id. at 347-48.)  Petitioner answered, "Yeah."  (Id. at 348.)

In the petition before this court, as he did on direct appeal, petitioner argues that

trial counsel's failure to elaborate on the ineffective assistance of counsel claim during the

hearing on the motion for new trial triggered an obligation by the trial court to conduct a

Marsden inquiry sua sponte.  (Pet. at 6A-6B; Answer, Ex. B at 80-84.)

Pursuant to California law, a trial court deciding a motion for new trial based on

ineffective assistance of trial counsel must proceed in the following fashion when the defendant

has requested new counsel for the purpose of arguing the motion:

the trial court must initially elicit and fully consider the defendant's reasons for believing he was ineffectively assisted at trial.  In so doing, the court must make such inquiries of the defendant and trial counsel as in the circumstances appear pertinent.  If the claim is based upon acts or omissions that occurred at trial or the effect

of which may be evaluated by what occurred at trial the court may
rule on the motion for new trial without substituting new counsel.
If, on the other hand, the claim of incompetence relates to acts or
omissions that did not occur at trial and cannot fairly be evaluated
by what occurred at trial, then, unless for other good and sufficient
reason the court thereupon grants a new trial, the court must
determine whether to substitute new counsel to develop the claim
of incompetence.  New counsel must be appointed when the
defendant presents a colorable claim that he was ineffectively
represented at trial; that is, if he credibly establishes to the
satisfaction of the court the possibility that trial counsel failed to
perform with reasonable diligence and that, as a result, a
determination more favorable to the defendant might have resulted
in the absence of counsel's failings.

People v. Stewart, 171 Cal.App.3d 388, 396-97 (1985).[12]

The California Court of Appeal denied petitioner's Marsden claim with the

following reasoning:

[Petitioner's] claim of incompetence relates to defense counsel's
failure to clarify the source of threats against Ms. Santa Cruz,
pursue the theory of a second gunman, and preclude the admission
of evidence from [petitioner's] bedroom.  These are all omissions
that can be evaluated by what occurred at trial.

After review of the record, we find the trial court correctly denied
[petitioner's] motion for a new trial based upon ineffective
assistance of counsel.  In our view, there is no showing that
[petitioner's] attorney performed incompetently in the context of
[petitioner's] list of purported errors.  "[T]here is no constitutional
right to an attorney who will conduct the defense of the case in
accordance with an indigent defendant's whims. [Citations.]"
(citations omitted).

Although [petitioner] contends his attorney erred when he failed to
clarify that the threats at trial came from a source other than
[petitioner], we cannot agree that was a point that needed
clarification.  As we explained previously, there was no indication
[petitioner] authorized or instigated the instances of witness
intimidation by the Okie gang.  Indeed, the common perception
would be that [petitioner's] fellow gang members, and not
[petitioner], had decided to intimidate witnesses in order to help

---

[12]   In People v. Smith, 6 Cal.4th 684, 696 (1993), The California Supreme Court
disapproved Stewart to the extent it suggested a defendant has a greater right at the later stage of
a trial to substitute counsel under Marsden.  The same standard applies equally pre-conviction
and post-conviction.  Id. at 694.

their confederate. The same rationale applies to [petitioner's] second contention of error. Danny Ledesma testified that he heard two distinct guns during the shooting. However, Detective Stratton testified Ledesma never stated that during the investigation or at the preliminary hearing. Indeed, Detective Stratton testified that Ledesma's testimony at trial was the first time he had heard about a second gun. Thus, there had been no reason for a ballistics test until Ledesma's testimony at trial. Nor would defense counsel want to pursue that theory under circumstances in which it is patently obvious that Ledesma was lying. Finally, defense counsel's failure to keep evidence (sic) of gang membership found in [petitioner's] bedroom cannot be construed as incompetence. That evidence was relevant and highly probative; it would have been admitted regardless of who represented [petitioner]. (Evid. Code, §§ 350, 352.)

Accordingly, we find [petitioner's] counsel performed competently during trial and that the court properly denied his motion for a new trial.

(Opinion at 20-21.)

The Sixth Amendment guarantees the right to the assistance of counsel in a criminal prosecution. Such assistance must be effective and competent. Strickland v. Washington, 466 U.S. 668 (1984). Although the Strickland decision specifically refers to "trial" proceedings, a motion for new trial is a "critical stage of the prosecution" warranting representation as well. Menefield v. Borg, 881 F.2d 696, 698-99 (9th Cir. 1989). Accordingly, a criminal defendant has a constitutional right to competent counsel in presenting a motion for new trial. Jackson v. Ylst, 921 F.2d 882, 888 (9th Cir. 1990) (citing Menefield, 881 F.2d at 699)).

Where a defendant is proceeding with the assistance of counsel, he may move to dismiss or substitute counsel, whether appointed or retained. The grant or denial of such a motion may depend on its timeliness and the nature of the conflict between the defendant and current counsel. United States v. McClendon, 782 F.2d 785, 789 (9th Cir. 1986). In assessing a claim that the state trial court erred in denying a request for substitute counsel in the context of a habeas corpus proceeding, "the Sixth Amendment requires on the record an appropriate inquiry into the grounds of such a motion, and that the matter be resolved on the merits before the case goes forward." Schell v. Witek, 218 F.3d 1017, 1025 (9th Cir. 2000) (en banc). See also

1  Hudson v. Rushen, 686 F.2d 826, 829 (9th Cir. 1982) ("Thus, the state trial court's summary

2  denial of a defendant's motion for new counsel without further inquiry violated the Sixth

3  Amendment.")

4             Petitioner's claim that the trial court had a duty to conduct a Marsden inquiry sua

5  sponte at the hearing on the motion for new trial should be denied.  Petitioner was asked whether

6  the motion for new trial adequately expressed his complaints about counsel's performance and he

7  answered in the affirmative.  Although he could have asked for new counsel to argue the motion

8  at that time, he did not do so.  At the hearing on the motion, the court heard argument from

9  counsel on the points petitioner wanted him to raise.  By this procedure, petitioner had an

10 opportunity to express his concerns regarding his trial counsel to the trial court.  The record of

11 the hearing on the motion for new trial reflects that petitioner's trial counsel competently argued

12 the motion for new trial, making sure the court was apprised of petitioner's claims regarding

13 counsel's performance.  Contrary to petitioner's assertions, counsel did not refuse to argue the

14 motion on his behalf.  Further, there is no evidence that petitioner suffered actual prejudice

15 because of any violation of his right to counsel and, indeed, no independent claim for ineffective

16 assistance of counsel has been presented to this court.  In the absence of good cause, petitioner

17 was not entitled to the automatic appointment of substitute counsel for purposes of pursuing a

18 new trial motion.  See Jackson, 921 F.2d at 887 (holding that "there is no automatic right to a

19 substitution of counsel simply because the defendant informs the trial court that he is dissatisfied

20 with appointed counsel's performance").  Put another way, a state court is not automatically

21 required to appoint substitute counsel whenever a motion for a new trial rests upon the alleged

22 incompetence of counsel.[13]

23

24     [13] Cf.  United States v. Del Muro, 87 F.3d 1078, 1080 (9th Cir. 1996) (Sixth Amendment
   violation found where court failed to appoint substitute counsel to pursue motion for new trial
25 placing defendant's lawyer in the untenable position of trying to show his own ineffectiveness at
   an evidentiary hearing on the motion).

26

1    The California Court of Appeal concluded that petitioner's counsel did not render

2 ineffective assistance at trial; therefore, under state law, the trial court had no obligation to

3 appoint new counsel for the purpose of arguing the motion for new trial on petitioner's behalf.

4 The court's decision in this regard is not contrary to or an unreasonable application of United

5 States Supreme Court authority.  Accordingly, petitioner is not entitled to relief on this claim.

6    For all of the foregoing reasons, IT IS HEREBY RECOMMENDED that

7 petitioner's application for a writ of habeas corpus be denied.

8    These findings and recommendations are submitted to the United States District

9 Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen

10 days after being served with these findings and recommendations, any party may file written

11 objections with the court and serve a copy on all parties.  Such a document should be captioned

12 "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

13 shall be served and filed within ten days after service of the objections.  The parties are advised

14 that failure to file objections within the specified time may waive the right to appeal the District

15 Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

16 DATED:  September 8, 2005.

17

18                                                      UNITED STATES MAGISTRATE JUDGE

19

20 008:torre2052.hc

21

22

23

24

25

26